**The STATE of Ohio, Appellee,**

**v.**

**JORDAN, Appellant.** ■

[Cite as *State v. Jordan* (1992), 73 Ohio App.3d 524.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 59555.

Decided Jan. 27, 1992.

*Stephanie Tubbs Jones*, Prosecuting Attorney, and *Fedele DeSantis*, for appellee.

*Daniel D. Domozick*, for appellant.

ANN McMANAMON, Judge.

This appeal raises troubling questions concerning police misconduct and due process. We note that neither the prosecutor nor defense counsel chose to appear at oral argument to address the issues. Upon our review of the record and applicable law, we are compelled to vacate in part, reverse in part and remand.

On January 26, 1990, Leonard Jordan went to trial on two counts of drug trafficking in the distribution of cocaine (R.C. 2925.03[A][2]); possession of cocaine in an amount exceeding the bulk amount but less than three times that amount (R.C. 2929.03[A][4]); and possession of criminal tools (R.C. 2923.24), "zip-lock bags, money." The state deleted purported "fake I.D.'s" from the latter charge on the morning of trial. The trial judge dismissed the charge as it related to the "zip-lock bags" pursuant to a Crim.R. 29 motion at the close of the state's case.

Jordan was convicted on the remaining charges after a jury trial. The trial court permitted him to remain on bond pending this appeal. His five assignments of error[1] challenge the weight and sufficiency of the evidence, conduct by the police and the court's failure to recognize certain of the offenses to be allied.

At the time of his arrest, Leonard Jordan was a freshman at Ohio State University, attending college on several academic scholarships and maintaining a 3.2 G.P.A. In high school he was a member of the National Honor Society, President of the Student Council, and salutatorian of his senior class.

Jordan grew up and lived near the Wilson housing project located on East 59th and Chester in Cleveland. He testified that on March 28, 1989, he had just arrived home in Cleveland for spring break and was walking through the project visiting friends he had not seen for months. On that same day, Detectives Keith Thompson, Ronald Dillions and Artara Adams of the Fifth District Strike Force led a drug sweep at the Wilson project. The detectives,

---

1. See Appendix.

who rode in an unmarked car, were responding to a complaint of males standing on the corner of East 57th and Curtis, flagging down autos and selling drugs.

At approximately 1:00 p.m., the detectives observed several men on that corner, and one in particular, flagging down approaching autos. Detective Thompson indicated this was common behavior for drug dealers attempting to stop potential customers. The detectives later identified the defendant as either the person or one of several persons flagging down cars.

Thompson and Dillions emerged from their vehicle and approached Jordan and one or two other men, from one direction, while Adams drove the car to where the men were standing and approached from the opposite direction. Both Thompson and Dillions testified that, as they approached Jordan, they heard someone shout "sixty-five," a street term indicating police were in the area. According to Thompson, defendant and another man walked away very quickly and detectives seized both of them. It was Thompson who "contained the defendant" and saw him drop "a plastic zip-lock packet" from his right hand. Neither Dillions nor Adams saw Jordan drop the bag. Dillions apprehended the other man, but later released him.

Detective Thompson testified that, within the plastic bag, he found ten small zip-lock plastic bags each containing five rocks of cocaine for a total of fifty rocks and a total weight of 9.23 grams. In contrast, Dillions and Adams swore that the fifty rocks of cocaine were not in ten separate bags as Thompson told the jury, but were actually contained in one bag. Once at the station, Adams averred he personally divided up the rocks of cocaine equally and placed them in the ten zip-lock bags because "this way it would be easier to count, transport back and forth, less chance of one falling out of a bag, less chance of them breaking up." The police report indicated the detectives found the cocaine contained in ten zip-lock bags. Despite this contradictory testimony, the departmental report and their own admissions, the police later obtained: (1) a felony indictment that Leonard Jordan possessed a criminal tool, to wit: zip-lock bags, when, in fact, these bags were supplied by the prosecuting officers themselves who knew they were never in the possession and control of Leonard Jordan; (2) an indictment for trafficking in drugs (R.C. 2925.03[A][2]), alleging that Leonard Jordan prepared cocaine for shipment, shipped, transported, delivered, prepared for distribution or distributed it, when, in fact, the cocaine provided to the Scientific Investigations Unit and shown to the jury was actually separately packaged by the police themselves.

At trial, Thompson and Dillions swore that Jordan had $590 in cash on his person as well as a New York State identification card and an Ohio State University I.D. card, one of which had an incorrect birth date. The police

report signed by Dillions indicates, however, that defendant possessed $190 when arrested. The detectives told the court and jury that this discrepancy was the result of a typographical error. A receipt from the county prosecutor to the officers for "unclaimed" funds in the amount of $590 also was admitted into evidence. The receipt is dated September 15, 1989, six months after Jordan's arrest. It also appears that Detective Dillions obtained this receipt from the prosecutor's office on the morning of trial. No contemporaneous receipt from Jordan for any sum of money was offered in evidence by the state.

Despite the fact that the charge of possession of criminal tools as it related to "fake I.D.'s" had been dismissed, Thompson averred that one of two cards Jordan carried contained a "bogus" birth date. Police produced neither card at trial. All three detectives stated that, once Jordan was taken into custody and advised of his constitutional rights, he confessed his guilt to them. Jordan allegedly told them he was selling cocaine for a man in East Cleveland who was putting him through college and providing him with extra money. The police never mentioned this purported confession in their written report and only brought it to the attention of the prosecutor and defense counsel on the morning of trial.

The defense offered the testimony of two eyewitnesses that it was the other man apprehended by police, not Jordan, who threw down the bag. Jordan also took the stand to deny flagging down autos and selling or possessing drugs. He explained he was merely walking through the project to visit friends when stopped by the police.

██ We choose to address Jordan's third assignment of error first since it is central to the disposition of this case. It is Jordan's position that police misconduct, in the form of tampering, destruction and the substitution of evidence violated his right to due process.

A review of all three detectives' testimony reveals police destroyed evidence and substituted their own. On direct examination, Thompson described to the jury how he found the cocaine in "ten small zip-lock bags" encased inside a larger plastic bag. He stated:

"Q. Okay. Now, your testimony is that you observed the dropping of a packet?

"A. Yes, I did.

"Q. Okay. And the person who dropped that, was it—what was it, a plastic bag? What was it?

"A. It's a plastic bag.

"Q. Okay. And inside this plastic bag were small packets, is that what you're saying?

"A. Yes, it was."

Thompson later reiterated he found the drugs in the zip-lock bags:

"Q. Showing you what has been marked as State's Exhibit No. 1, can you tell me what that is and what it contains?

"A. Okay. This is a Cleveland Police Department property envelope we use.

"Q. Do you recognize it?

"A. Yes, I do.

"Q. Okay. Go ahead. What is it?

"A. Okay. It's used to place evidence that we find into it.

"Q. Okay. Would you open it and see what is inside?

"A. There are ten small zip-lock plastic packets containing rock cocaine.
"* * *

"Q. Okay. Now, who retrieved the bag that he dropped?

"A. I did.

"Q. Okay, and what did you do with that bag?

"A. That bag was discarded because this was, all of these ten packets right here were in a bigger plastic bag, it was ripped up at the time and balled up.

"Q. Okay.

"A. And we discarded it at the fifth district."

Thus, Thompson implicated both himself and the other detectives in discarding the "bigger plastic bag." Although Detective Dillions originally swore the cocaine was in zip-lock bags when found, he later recanted this testimony. Dillions ultimately corroborated Thompson's admissions as did Detective Adams. According to Dillions, the bag was thrown away because "the plastic was cheap" and "it would tear," while Adams stated it was "flimsy." The actions of the detectives patently constitute the destruction and substitution of evidence.

Although a series of cases have analyzed the standard of review when police and/or prosecutors fail to preserve evidence, we find them essentially inapplicable to the matter before us. *California v. Trombetta* (1984), 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413, dealt with the destruction of breathalyzer results which the state was not required to maintain. *Arizona*

*v. Youngblood* (1988), 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281, involved the negligent failure to preserve material evidence exculpatory to a defendant.

The distillate of these cases appears to be that, to violate due process, evidence destroyed by police must be exculpatory in nature and the destruction must be done in bad faith.

Since the destruction by police in this case was deliberate and their actions in substituting evidence purposeful *vis-a-vis* obtaining indictments, we might wonder about the initial condition of the drugs and the bag in which they were allegedly found. We need not reach the question, however, of the exculpatory nature of the destroyed bag because we hold that, by destroying and then substituting other evidence and securing indictments based upon it, the police actions in themselves constituted a violation of Jordan's right to due process under the Due Process Clause of the Fourteenth Amendment.

In viewing the detectives' actions, we find they discarded the larger plastic bag and placed the cocaine in separate smaller zip-lock bags, not only in a calculated effort to destroy evidence, but with a larger purpose in mind: to give the appearance of separate unit doses, with the intention of obtaining an additional felony indictment for possession of criminal tools as well as drug trafficking in the preparation of cocaine for sale. As noted *infra*, the police wrote their own zip-lock bags into their police report and then sought indictments based on them.

At trial, the officers further staged a dramatic presentation designed to lead the jurors into believing the defendant packaged fifty rocks of cocaine into ten bags, in readily identifiable unit doses. Detective Thompson observed that the zip-lock bags he falsely swore were found at the scene are commonly used by drug dealers. He testified on direct examination:

"Q. Okay. Now, would you hold up one of those packets to the ladies and gentlemen of the jury?

"A. (Indicating).

"Q. Now, can you tell me, based on your experience as a fifth district strike officer, have you seen packets like that before?

"A. Yes, I have.

"Q. And in what context?

"A. Normally drug dealers carry those around and they put the drugs in there and sell it on the street.

"Q. And why is that? Is there any purpose?

"A. It's easier to carry around and they can conceal it better.

"Q. Okay. Can you buy those packets at a grocery store?

"A. No, you cannot."

He continued:

"Q. Okay. Now, would you hold up one of the packets? Now, how many rocks are in that bag, in that little packet?

"A. This one has five.

"Q. Now, what would be the street value of that packet?

"A. This would go from anywhere from about a hundred dollars on up.

"Q. Hundred?

"A. Hundred bucks on up.

"Q. On up. Okay. So your testimony—Do all the packets have five rocks, by the way, just, if you can tell?

"A. Some have six, but most of them look like five.

"Q. Okay. So then your testimony is that for fifty rocks on the street, that's probably worth what, a thousand?

"A. Yeah. Close to a thousand dollars."

As we noted, Detective Dillions initially confirmed Thompson's allegations during the state's case-in-chief as to the significance of these plastic packets. Dillions testified:

"Q. All right. Now, in your experience as a police officer, have you seen this size packet before?

"A. Yes.

"Q. Okay. And can you tell me—By the way, how many felony drug arrests have you made?

"A. Hundreds.

"Q. And have you seen packets like that—

"A. Yes.

"Q. —in felony drug arrests?

"A. Yes.

"Q. And what are those packets usually used for?

"A. Normally they're used to, in smaller packets especially to contain crack, cocaine. Keeps them fresh.

"Q. Have you seen them used like that in previous occasions?

"A. Yes.

"Q. By the way, can you buy those at a store that you know of, I mean a grocery store?

"A. No. You can't go into the average store to buy them there. I don't know where you would buy them at actually, probably a head shop."

Both Thompson and Dillions admitted on cross-examination that in order to secure the bulk amount necessary under R.C. 2925.03 there must be at least twenty-five unit doses or, alternatively, the cocaine must weigh at least ten grams. The cocaine in evidence weighed 9.23 grams.

Detective Dillions impeached his earlier testimony and that of Detective Thompson by later acknowledging that the zip-lock bags were provided and prepared by the police themselves. He acknowledged that the police report incorrectly stated that ten bags were seized from defendant, not one.

Defense counsel then confronted Dillions with Thompson's version of the seizure of ten zip-lock bags:

"Q. Okay. Now, Detective Thompson testified that there were fifty rocks and there were ten zip-lock bags in this baggie?

"A. Hmm-hmm.

"Q. Would he be correct or incorrect?

"A. As I recall, there was one bag full of cocaine.

"Q. Okay.

"A. Rock cocaine.

"Q. So you are not sure about the zip-lock bags, are you?

"A. No.

"Q. But in the report it says zip-lock bags, right?

"A. Yes."

Finally, Detective Adams explained how the cocaine got from the plastic bag originally found to the ten zip-lock bags:

"Q. Okay. Now, did Thompson show you anything?

"A. He showed me a plastic bag like a sandwich bag.

"Q. Okay. And what did you do with that?

"A. I took it and we conveyed the male to the fifth district.

"Q. Okay. So you kept possession of it while you conveyed him to the district?

"A. Yes.

" * * *

"Q. Okay. Now, you took this to the district?

"A. Yes.

"Q. And what did you do with it?

"A. I took it up to my office.

"Q. Where?

"A. I took it up to my strike force office.

"Q. What did you do with it?

"A. Turned it, dumped it out on my desk, and because the bag it was in [*sic*] was kind of flimsy, I got little zip-lock bags, counted them and put five in each bag.

"Q. Okay. And how many zip-lock bags did you use?

"A. Ten.

"Q. And who was with you at the time?

"A. Detective Dillions was in the room."

We find the introduction of the ten police-owned bags into evidence and the testimony of Thompson and Dillions as to their significance was highly prejudicial to Jordan. The destruction and substitution of evidence, as well as the presentation of this evidence at trial, was done in bad faith in order to secure trafficking and possession of criminal tools convictions. We conclude that police misconduct in the presentation of substituted evidence violated Jordan's right to due process.

Defendant's third assignment of error is well taken and warrants reversal of his convictions and a new trial.

■ In Jordan's first assignment, he argues his convictions are against the manifest weight of the evidence.

■ In reviewing a challenge to the manifest weight of the evidence, this court must view the entire record, weight the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether "the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720. A new trial should be granted only where the evidence weighs heavily against conviction. *Id.* Further, we are mindful that the evaluation of witness credibility primarily lies with the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212.

Defendant was convicted of drug trafficking under R.C. 2925.03(A)(2) and (A)(4) which provided in part:

"(A) No person shall knowingly do any of the following:

"(2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance, when the offender knows or has reason-

able cause to believe such drug is intended for sale or resale by the offender or another;

" * * *

"(4) Possess a controlled substance in an amount equal to or exceeding the bulk amount but in an amount less than three times that amount[.]"

He also was convicted of possessing criminal tools (R.C. 2923.24) ("money") which provides in part:

"(A) No person shall possess or have under his control any substance, device, instrument, or article, with purpose to use it criminally.

"(B) Each of the following constitutes prima-facie evidence of criminal purpose:

" * * *

"(3) Possession or control of any substance, device, instrument, or article commonly used for criminal purposes, under circumstances indicating such item is intended for criminal use."

The detectives presented conflicting versions of the actions of the defendant and others on the street corner at Jordan's trial. Detective Thompson testified:

"Q. And you saw how many males at the 57th Street area?

"A. At that time it was several, wasn't that many, maybe three or four or five, somewhere in that.

"Q. And would you say they all were flagging down cars?

"A. No. Just he. Just he was.

"Q. I see. What were the others doing?

"A. They were standing around.

"Q. Watching this one person flag down cars?

"A. I don't know if they were watching him."

Dillions and Adams, however, swore they saw several men flagging down cars. Dillions stated:

"A. * * * And we observed males in the area attempting to flag down autos, standing around loitering and in this area that's the type of activity that drug dealers do, they stand around and wait for somebody to come by, if some one just happens to park their car, they will do this."

Adams testified:

"Q. And what did you observe?

"A. We observed maybe four to six males in the area stopping traffic, cars were pulling up, making what we believe to be drug transactions."

Though the detectives were sure they saw defendant on the corner, none could recall what he was wearing. Thompson stated on cross-examination:

"Q. And you could clearly see that this young man was the one flagging down cars?

"A. Considering what he was wearing that day, yeah.

"Q. And what was he wearing?

"A. At this time I don't remember.

"Q. All right. What were the other men wearing?

"A. I don't remember, and I can't recall exactly clothing that anyone had on that day."

Dillions also stated:

"Q. And was your fellow officer with you at that time, Detective Thompson?

"A. Yes.

"Q. Would it be fair to say that he likely saw the same thing that you did—

"A. Yes. That's—

"Q. —that there were several people doing this?

"A. Yes.

"Q. Did you notice how the people were dressed?

"A. No. I don't recall. If I did, I don't recall.

"Q. Okay. Would it be fair to say that they were all probably dressed about the same, jeans and the like?

"A. You're going a year—I don't know. Probably, yeah. Probably. I don't know."

Finally, Adams stated:

"Q. He said—Okay. Now, you said that you saw the defendant flagging down cars?

"A. Yes.

"Q. How was he dressed?

"A. I think pretty neatly dressed.

"Q. And in what sense?

"A. Just neat.

"Q. Were his clothes light, dark?

"A. I can't remember."

Detective Thompson, who also falsely swore he found the police zip-lock bags inside a larger plastic bag, was the only witness to testify he saw Jordan throw down the bag of purported cocaine. Detective Dillions, also present at the scene, did not see the defendant do this. Defendant, on the other hand, offered the testimony of two eyewitnesses who testified the other man apprehended, not defendant, threw down the bag. Jordan's conviction for possession of cocaine then, is based only upon the testimony of Officer Thompson who was thoroughly controverted and impeached at trial.

We recognize other notable discrepancies in the state's case. Both Thompson and Dillions averred that, when apprehended, Jordan had $590 on his person. In contrast, the police report signed by Dillions stated the detectives recovered $190. When confronted with this discrepancy, both stated it was a typographical error. The detectives produced a receipt for unclaimed funds they allegedly deposited in the prosecutor's office in the amount of $590. We note this receipt is dated six months after defendant's arrest. The colloquy at trial between Dillions and the prosecutor reveals Dillions first obtained the receipt at the prosecutor's request the morning of trial, ten months after Jordan was arrested. The prosecutor queried:

"Q. Showing you what's been marked as State's Exhibit No. 2, can you tell me what that is?

"A. This is a receipt from the County of Cuyahoga for unclaimed funds held in the prosecutor [*sic*] attorney's office.

"Q. Okay. Let me ask you this; did you get that at my request?

"A. Yes, I did.

"Q. Okay. And where did you go?

"A. We went to the eighth floor.

"Q. And who did you speak to?

"A. We spoke to a lady, Elaine, I believe her name is.

"Q. Could it be Eleanor?

"A. Eleanor. I'm sorry.

"Q. Hilow?

"A. Yes.

"Q. Did she sign that form?

"A. Yes, she did.

"Q. Did you watch her?

"A.  Yes, I did.

"Q.  Did she write my name on that form?

"A.  Yes, she did.

" * * *

"Q.  First time you saw that sheet was today?

"A.  Yes.

"Q.  And that was the first time I asked you to get it, is that right?

"A.  Yes."

According to the detectives, when arrested, Jordan allegedly confessed orally to them, stating he was selling drugs for a man in East Cleveland who was putting him through college.  The police report made no reference to this alleged confession.  In fact, police first informed the prosecutor and defense counsel of this confession on the morning of trial.

Detectives Thompson and Dillions stated that at no time during the arrest of defendant did they pull out their guns or point them at him.  Detective Adams, who came on the scene during Jordan's arrest, impeached this testimony as follows:

"Q.  Do you know who, did you draw a gun, a gun or anything on these people when you arrived?

"A.  When I pulled around the corner, they had them in custody, I had no reason to draw a gun.  I had my gun out.

"Q.  Did you see a gun pull—Did you see guns pulled around?

"A.  Whenever we're in a drug area, we always have the guns out of our holsters.

"Q.  Was there a gun pulled on Mr. Jordan?

"A.  I pulled on him, I can't remember, but everybody, everyone had their gun out."

Finally, the detectives told the jury that Jordan allegedly carried fake I.D.'s, one indicating he was older than his age.  Defendant denied that either I.D. was fake or altered.  At trial, police produced neither identification card.

■  In determining whether a conviction is against the manifest weight of the evidence, the following factors must be taken into account by the reviewing court:

"1.  The reviewing court is not required to accept as true the incredible;

"2.  whether the evidence is uncontradicted;

"3.  whether a witness was impeached;

"4. what was not proved;

"5. the certainty of the evidence;

"6. the reliability of the evidence;

"7. whether a witness' testimony is self-serving;

"8. whether the evidence is vague, uncertain, conflicting or fragmentary." (Emphasis deleted.) *State v. Mattison* (1985), 23 Ohio App.3d 10, 23 OBR 43, 490 N.E.2d 926, syllabus.

These factors are "merely guidelines to be taken into account when weighing the evidence," and are not considered to be "hard and fast rules." *Id.* at 14, 23 OBR at 47, 490 N.E.2d at 930.

A majority of the *Mattison* guidelines have been met in the present case. The evidence surrounding defendant's conviction was controverted in several ways, particularly by Dillions and Adams, who both impeached Thompson's testimony. Since the cocaine found near defendant was not initially found in the zip-lock bags, "the certainty of the evidence" is drawn into question. Any evidence concerning these zip-lock bags cannot be considered reliable.

Essentially, defendant's guilt hinges on Detective Thompson's testimony that he saw Jordan drop the bag. Not only was this testimony rebutted by two eyewitnesses of the defendant, but its reliability and Thompson's credibility is drawn into question.

Upon review of the record, a majority of the panel find the evidence does not support defendant's convictions beyond a reasonable doubt and conclude that the jury clearly lost its way. We recognize, however, that Section 3(B)(3) of Article IV of the Ohio Constitution provides in part: " * * * No judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." Since one member of this panel does not agree that the convictions are against the manifest weight of the evidence, the majority, which does, is prohibited from sustaining this assignment.

Accordingly, the first assignment is overruled.

■ In his second assignment, Jordan challenges the sufficiency of the evidence on his conviction for possession of cocaine exceeding the bulk amount but less than three times that amount, and, in his fifth assignment, the sufficiency of the evidence on his conviction for possession of criminal tools.

■ A challenge to the sufficiency of the evidence requires this court to view the record in a light most favorable to the prosecution and determine whether rational minds could have found each material element of an offense

was proven beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

Defendant testified that, after he was taken into custody, he saw the plastic bag and inside it was a white object "half the size of a golf ball." It is undisputed that the cocaine found weighed 9.23 grams.

"Bulk amount" is defined in R.C. 2925.01(E)(1) as:

"An amount equal to or exceeding ten grams or twenty-five unit doses of a compound, mixture, preparation, or substance which is, or which contains any amount of, a schedule I opiate or opium derivative, or cocaine[.]"

"Unit dose" is further defined in R.C. 2925.01(F) as:

" * * * [A]n amount or unit of a compound, mixture, or preparation containing a controlled substance, such amount or unit being separately identifiable and in such form as to indicate that it is the amount or unit by which the controlled substance is separately administered to or taken by an individual."

All three detectives testified there were fifty rocks, thus, fifty unit doses of cocaine in the bag found. Moreover, the Scientific Examiner for the state also counted fifty "rocks" when the suspected narcotics tested positive for cocaine.

Although it is undisputed that the police packaged the "rocks" in their own zip-lock bags, viewing the evidence in a light most favorable to the prosecution, we find a reasonable jury could find that the cocaine entered into evidence met the unit dose requirements of the statute. Further, under the same test, a jury could permissibly reject the impeached testimony of Detective Thompson and accept his statement that he saw the defendant drop the bag of cocaine, thus being in possession of it. We take into consideration in making this finding that the officers' use of the cocaine provided in police zip-lock bags to secure indictments was not within the knowledge and comprehension of the jury.

■ As to Jordan's conviction for having a sum of money as a criminal tool, we find the evidence insufficient to support it. We have already discussed the discrepancy in the amount of cash defendant allegedly had on his person. The police report indicated $190, while the detectives stated at trial ten months later, that Jordan had $590.

Jordan testified he cashed checks from student loans in the amount of $365 two days before returning to Cleveland on spring break. He claims he spent some part of this cash before his arrest. We are faced with the defendant's explanation and police testimony in conflict with itself and unsupported by a receipt from the defendant or any documentation as to what occurred when the cash was removed from Jordan's person. Thus, we conclude that the evidence is insufficient to warrant defendant's conviction for possession of

criminal tools. Accordingly, the second assignment of error is overruled and the fifth assignment is sustained.

■ Although not raised as an assignment, we recognize as plain error defendant's conviction under R.C. 2925.03(A)(2) since it also is not sustained by the evidence.

Plain error is present when, but for the error, "the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 97, 7 O.O.3d 178, 181, 372 N.E.2d 804, 808; *State v. Underwood* (1983), 3 Ohio St.3d 12, 13, 3 OBR 360, 360, 444 N.E.2d 1332, 1333. It should only be invoked in exceptional circumstances to avoid a miscarriage of justice. *Long, supra,* 53 Ohio St.2d at 96, 7 O.O.3d at 180, 372 N.E.2d at 807.

■ The record demonstrates that, apart from fifty rocks of cocaine found near Jordan, there were no other quantities found on his person. On this basis, and assuming detective Thompson is credible, the defendant's conviction for possession of cocaine (R.C. 2925.03[A][4]) is sustained by the record. The same cannot be said for his conviction under (A)(2). The cocaine was packaged into the zip-lock bags by the police, not Jordan. Absent these zip-lock bags, there was no evidence that Jordan prepared cocaine for shipment, shipped, transported, delivered, prepared for distribution, or distributed it.

We conclude that the evidence is insufficient to support defendant's conviction. Rational minds could not have found each material element of R.C. 2925.03(A)(2) proven beyond a reasonable doubt. Thus, defendant's conviction under this count constituted plain error.

■ In his fourth assignment of error, Jordan claims his convictions for drug trafficking under R.C. 2925.03(A)(2) and (A)(4) constitute allied offenses of similar import under R.C. 2941.25.

R.C. 2941.25 provides in part:

"(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."

The Ohio Supreme Court has instituted a two-part test to determine whether offenses are allied. First, the elements of the crime are compared to determine if they correspond to such a degree that the commission of one crime will result in the commission of the other. If this part of the test is satisfied, the offenses are allied and the court must proceed to the second step. The court must then determine if the crimes were committed separately, or with a separate animus. If so, a defendant may be convicted of both offenses. *Newark v. Vazirani* (1990), 48 Ohio St.3d 81, 549 N.E.2d 520,

syllabus; *State v. Blankenship* (1988), 38 Ohio St.3d 116, 117, 526 N.E.2d 816, 817.

This court has considered challenges under R.C. 2941.25 similar to the present case. In *State v. Pall* (Sept. 12, 1991), Cuyahoga App. No. 59232 unreported, 1991 WL 180070, and *State v. Mateo* (Aug. 17, 1989), Cuyahoga App. No. 55833, unreported, 1989 WL 95760, reversed in part and affirmed in part on other grounds (1991), 57 Ohio St.3d 50, 565 N.E.2d 590, the defendants challenged their convictions under R.C. 2925.03(A)(2) and (A)(6), arguing the offenses were allied. The *Mateo* court held these offenses are not allied since R.C. 2925.03(A)(2) "imposes the additional element that possession of the controlled substance is incident to preparation for shipment, transportation, delivery or distribution of the drug through a sale." *Id.* at 5. Thus, under the first part of the test, the charges do not correspond to a sufficient degree.

The same is true here: R.C. 2925.03(A)(2) imposes an additional element not present in (A)(4). Therefore, under the first prong of the Supreme Court test, these offenses are not allied and our analysis ends.

We recognize our decision stands in conflict with decisions from the First District. In *State v. Carter* (Dec. 19, 1990), Hamilton App. No. C–890787, unreported, 1990 WL 209676, the court held that R.C. 2925.03(A)(2) and (A)(4) are allied offenses of similar import "since implicit in the offense of trafficking under R.C. 2925.03(A)(2) is the offense of possession under 2925.03(A)(4), and both counts referred to the same quantity of drugs." *Id.* at 5.

In *State v. Jennings* (1987), 42 Ohio App.3d 179, 183, 537 N.E.2d 685, 689, the court cited *State v. Roberts* (1980), 62 Ohio St.2d 170, 183, 16 O.O.3d 201, 405 N.E.2d 247, in holding:

" * * * [W]hen charges of both sale and possession of drugs are based on a single transaction involving the same type and quantity of drugs, and the defendant did not possess any quantity in excess of the amount sold, the defendant may be indicted for both sale and possession, but can be convicted of only one offense under R.C. 2941.25(A)."

In *Jennings,* the defendant was charged with two counts of drug trafficking under R.C. 2925.03(A)(2) and two counts of drug abuse under R.C. 2925.11.

Despite this conflict in case law, we are bound to follow precedent within our district. Accordingly, this assignment is not well taken.

Defendant's convictions under R.C. 2925.03(A)(2) and 2923.24 are vacated and judgment is entered for defendant on these counts. Defendant's conviction under R.C. 2925.03(A)(4) is reversed and the cause is remanded for a new trial.

*Judgment accordingly.*

HARPER, J., concurs.

SPELLACY, J., dissents in part.

APPENDIX

Appellant's assignments of error are:

I

"Appellant's conviction is contrary to the manifest weight of the evidence."

II

"The evidence is insufficient to convict appellant of possession exceeding the bulk amount."

III

"Police misconduct in the form of tampering with evidence and manufacturing evidence constitutes a denial of due process and warrants reversal."

IV

"Appellant's conviction of aggravated trafficking and possession exceeding the bulk amount violates the multiple counts provisions of R.C. Section 2941.25."

V

"The evidence is insufficient to convict appellant of possession of criminal tools."

SPELLACY, Judge, dissenting in part.

Initially, I must respectfully dissent from the majority's sustaining of appellant's third assignment and its order for a new trial. I disagree with the majority's findings that the Cleveland police officers engaged in misconduct, in the form of tampering, destruction and the substitution of evidence.

Admittedly, I find that the ten small zip-lock bags, which ultimately held the fifty rocks of cocaine, were supplied by the Cleveland police officers and were not confiscated from appellant at the crime scene. However, I find nothing in the record to indicate that the police purposely destroyed the original "baggie" and substituted their own evidence in order to obtain an indictment.

The evidence, in this case, clearly indicates that the police placed the seized rock cocaine into the ten small zip-lock bags, in order to preserve and safeguard the evidence. The police were required to handle fifty rocks of

cocaine that were originally found in a torn plastic bag. I find that the police properly secured the evidence by using the ten zip-lock bags of their own.

Since I believe that the evidence fails to demonstrate any tampering, destruction or substitution of evidence, I would overrule appellant's third assignment of error.

With regard to the majority's ruling on appellant's first assignment of error, that his convictions are against the manifest weight of the evidence, I disagree with the majority's finding that the evidence does not support appellant's convictions and that the jury clearly lost its way.

In *State v. Martin* (1983), 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717, the court set forth the test to be applied when addressing the issue of manifest weight of the evidence. The *Martin* court stated at 175, 20 OBR at 216, 485 N.E.2d at 720:

"The court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

The weight of the evidence and credibility of witnesses are primarily an issue for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. A jury is entitled to believe or not to believe the testimony of the state's witnesses and/or the defense's witnesses. *State v. Antill* (1964), 176 Ohio St. 61, 26 O.O.2d 366, 197 N.E.2d 548.

In the instant case, it is undisputed that there were some inconsistencies in the testimony of the state's witnesses regarding the confiscation of the cocaine, the "plastic baggie" and the money. However, these inconsistencies were before the jury and considered by the jury. The jury was entitled to weigh the conflicting evidence and consider the credibility of each witness. The jury chose to believe Detective Thompson's testimony that he observed appellant drop a plastic bag containing numerous rocks of cocaine. In fact, the trial court, in a lengthy charge, instructed the jury as follows:

"You are the judges of the credibility of the witnesses, you can use the tests of truthfulness which you use in your daily lives to determine whether someone is truthful or candid with you.

"The Court can give you these tests to assist you; you can consider the appearance of each witness on the stand, his or her manner of testifying, the reasonableness of the testimony, the opportunity the witness had to see and

hear that which he or she testified to, one's accuracy of memory, frankness or lack of it, intelligence, interest and bias, if any.

"So that in appraising these tests, you can assign to each witness such weight that you deem it deserves. And the fact that a person is placed under oath does not mean you have to believe all of that, obviously, that person has said.

"You are entitled to believe all or part or none of what a witness has told you. Now, as the jurors in the case you are the sole deciders of the fact, and any disputes between the versions given by the individual witnesses, so that the Court does not, in its instruction, give you any statement of what the Court thinks has been proven or disproven."

Upon a careful review of the entire record, I cannot find that the jury lost its way and created such a manifest miscarriage of justice that appellant's convictions must be reversed and a new trial ordered. It is relatively clear that the jury chose to believe portions of the state's witnesses and chose not to believe appellant's witnesses and his testimony.

Finally, I respectfully dissent from the majority that there was insufficient evidence to support appellant's conviction for possession of criminal tools, *i.e.*, money. The evidence in this case demonstrated that $590 was found on appellant at the time of his arrest. Although the police report reflected that $190 was confiscated, it was established at trial that the police report contained a typographical error. The police officers' testimonies and a report from the county prosecutor showed that $590 was found on appellant.

Viewing this evidence in a light most favorable to the state, I find that the jury could reasonably conclude that the money was used to facilitate drug activity and, thus, was a criminal tool within the meaning of the statute. Accordingly, I dissent from the trial court's sustaining of appellant's fifth assignment of error.

From the record as we have it, I conclude that appellant's convictions for possession of cocaine under R.C. 2925.03(A)(4) and possession of criminal tools under R.C. 2923.24 are thoroughly logical and justified by the circumstances demonstrated. Therefore, I disagree with the majority's order that appellant is entitled to a new trial on the charge of possession of cocaine and that his conviction for possession of criminal tools must be vacated.