**The STATE of Ohio, Appellee,**

**v.**

**POOLE, Appellant.**

[Cite as *State v. Poole* (1996), 116 Ohio App.3d 513.]

Court of Appeals of Ohio,
Seventh District, Mahoning County.

No. 94 C.A. 205.

Decided Dec. 24, 1996.

514

*James A. Philomena,* Mahoning County Prosecuting Attorney, and *Michele G. Cerni,* Assistant Prosecuting Attorney, for appellee.

*Marilyn M. McMillin,* for appellant.

---

GENE DONOFRIO, Judge.

Defendant-appellant, Marcus Poole, appeals his conviction on two counts of aggravated murder, with firearm specifications.

In the early morning hours of March 24, 1994, two women, Ladorsa ("Jay") Backus and Melelia ("Buttons") Howell, were shot and killed in the living room of the house where they lived with Jay's daughter, Kimyasa ("Kim") Backus (age fourteen) and Buttons's children, Sharlinda (age six) and Anthony (age three). Appellant was later arrested and indicted for the murders.

Prior to the start of trial, appellant moved to suppress the testimony of appellee state of Ohio's key witness, Kim Backus, on the basis that Kim's voice identification of appellant was not reliable. The trial court, after hearing, overruled the motion to suppress, finding that since the identification had not been obtained illegally, the motion to suppress was not the proper vehicle for testing the admissibility of the testimony.

Jury selection began on October 19, 1994. During the voir dire, appellant's counsel objected to appellee's exercise of a peremptory challenge to a juror, Jonette Edmonds, the only black juror on the panel at that time. Appellant's counsel objected on the basis that the peremptory was racially based.

In response, the prosecutor stated that his reasons for excusing Edmonds were nonracial in nature. The prosecutor stated:

"First, the incident involving her brother—he had been charged with what appears, in talking to her, to be [a] fairly serious charge. It sounded like felonious sexual penetration, which would be a nonprobationable aggravated felony; however, the case had been resolved in his favor to—he pled no contest and was found guilty and apparently received the conviction on a misdemeanor and received some type of probation. And that contact with the criminal justice system bothered me.

"The second thing that I was concerned about was because of her employment at the north side office of the National City Bank: She indicated she was familiar with people in that area. And it may well be that some of the people who testify in this case may be from that area, and she may know of those people when they get on the stand or she may remember certain things because of her familiarity with the folks in that area.

"My third concern was because she does work with a bank she deals with mathematical standard of proof. And with my experience as a prosecutor for over the last two decades has been the people who deal with mathematical standards of proof tend to expect a higher standard of proof to prove beyond a reasonable doubt even though they indicate that they can follow the law. I've run into that in a number of cases, but that does bother me. And for all of those reasons I exercised my peremptory challenge."

The trial court subsequently sustained appellee's peremptory challenge.

After the jury was seated, evidence was presented. Kim Backus testified, over the objection of appellant, that on the night of the incident, she had gone to bed in her mother's bedroom, located in the upstairs rear of the house at 132 Tod Lane, Youngstown, Ohio. In the middle of the night, she was awakened by a knock downstairs at the rear door of the home. She testified that she heard Buttons call, "Who is it?" from the bedroom located across the hall in the front of the house, where Buttons was sleeping with her children. Kim testified that she heard the person at the door say "Marcus" and that Buttons then asked again who it was. The person replied "Marcus." Kim testified that when Buttons asked again who it was, the person said "Tony." Kim testified that Buttons then came into the room where she and her mother were sleeping, looked out the rear window and again asked who it was. The person replied "Marcus" this time.

Kim further testified that her mother was awake by this time and told Buttons not to answer the door. Kim testified that Buttons nonetheless went downstairs and that she heard Buttons and the person talking for about twenty minutes. Kim testified that Marcus then called to her mother to go downstairs and that Buttons also called to her. Kim testified that Jay went down and that she heard Marcus ask Jay if Buttons was messing around. Kim then heard the three move into the living room, where they were talking and laughing. Kim testified that she then heard three gunshots, a scream and then three more gunshots. Kim testified that she then went into Buttons's bedroom, where Buttons's children were sleeping and that, after about five minutes, she heard the person leave. Kim testified that the digital clock in Buttons's room read 5:08 at this time.

Kim testified that she then woke up the children and took them out the back door of the house and across the street to the house of her friend, Charlene

Waller. Charlene's father took her to a phone booth and then to Kim's grandmother's house, where she called the police.

Kim further testified that when the police came, she gave them a statement, telling the police that the perpetrator was "Marcus." She testified that she did not know appellant's last name at that time.

Kim testified on direct examination that she had known appellant prior to the incident because he had been coming over to the house for two or three months to see Buttons. She testified that the first time she met him she was having a party at the house and appellant had come to see Buttons. Kim also testified that, aside from seeing him at the house, she saw appellant on Benita Avenue and on New York Avenue and that she heard him talk to people out on the street.

Kim further testified on direct that she would sometimes answer the phone when appellant would call and that she would recognize his voice. Kim also testified that when appellant came to the house and knocked on the door, he would sometimes give a different name when asked who it was. Kim testified that she recognized his voice on these occasions.

Kim further testified on direct that, for about one month, appellant didn't come to the house at all but then he had come to see Buttons the day before the killings. Kim further testified that Buttons had an old boyfriend named Tony and that the voice of the person at the door that evening did not sound like Tony's. She also testified that the voice did not sound like that of Buttons's fiance, Kevin Brown, or like Jay's friend. Kim testified that appellant's voice was distinctively loud and deep.

On cross-examination, Kim acknowledged that Buttons had been in jail during some part of January and February 1994. Based on this, she acknowledged that she could only have known appellant for about six weeks. She also acknowledged that, during this time, she never spoke to appellant face-to-face but that she only overheard him speaking at times. Kim further acknowledged that their phone was disconnected at the time of the incident and had been disconnected for about one month, so that there wouldn't have been much of an opportunity for her to talk on the phone with appellant.

Officer Zaida Miranda of the Youngstown Police Department also testified. Officer Miranda testified that she and Officer Coleman were on patrol at approximately 5:20 a.m. on March 24, 1994 when they were dispatched to 132 Tod Lane. She testified that upon their arrival, they were approached by Kim Backus and her grandmother, Carol Reese. Officer Miranda interviewed Kim and later made a report in which she wrote that Kim had told her that the knock had been at the front door of the house. Officer Miranda's report did not mention Buttons's coming into the back bedroom and looking out of the window

before going downstairs. Officer Miranda further testified that they obtained the name of Marcus as a suspect at that time. Officer Miranda also testified that Kim told her that the suspect had said the name "Tony" during the knocking but that she did not write this in her report.

Detective Sergeant David McKnight also testified. Det. McKnight testified that he was dispatched to the scene at approximately 6:15 a.m. Det. McKnight testified that he was interviewing the neighbors, the Muhammads, when they received a telephone call. Based on this call, Det. McKnight was able to locate appellant at 45 Benita, where appellant was taken into custody at approximately 7:00 a.m.

The police later found a black jumpsuit soaking in the bathtub at 45 Benita.

After appellant was taken into custody, the officers took a photograph of him. Det. McKnight showed it to Kim Backus, who identified him as the "Marcus" mentioned in her statement.

Det. McKnight further testified that, later that afternoon, he found a set of footprints in a flowerbed located in the rear yards between 127 and 133 New York, which is a street located between Tod and Benita. Det. McKnight testified that the officers photographed the best print and that they then had a plaster cast made of the print. He also testified that he requested that the booking officers at the jail retrieve appellant's shoes.

Appellee also presented the testimony of Jeffrey Lynn, a forensic scientist employed by the Ohio Bureau of Criminal Investigation. Lynn testified that the atomic absorption test performed on appellant had resulted in a negative reading. Lynn also testified that he had performed a shoe-print comparison on the plaster cast and appellant's shoe. Over the objection of appellant, Lynn testified that the right shoe retrieved from appellant had the same tread design and general size characteristics as the plaster cast.

Officer Mike Geraci, Youngstown Police Department, testified that he was dispatched at 3:25 a.m. on March 24, 1994 to 45 Benita in reference to an aggravated menacing report. Officer Geraci testified that he spoke with appellant at this time. Appellant indicated that his girlfriend, "Sherry" (sic, Shelly) Taylor, was threatening his life and that he wanted to make a report on her. Officer Geraci testified that he completed his report at 3:45 a.m.

Appellant testified on his own behalf. He also presented the testimony of his aunt, Sharon McMean; his girlfriend Shelly Taylor; and Trabion Simpson, a niece of Sharon McMean. They testified that appellant had been at Partner's Lounge earlier in the evening and that he fought with Shelly Taylor there. He and Sharon McMean left the bar sometime after 2:00 a.m. and went to a "bottle club," where they bought liquor. They then went back to Sharon McMean's

house at 45 Benita and began to play cards. At one point, appellant left the residence to buy cigarettes and then returned to 45 Benita, where he eventually went to sleep.

After appellant presented the testimony of Trabion Simpson, appellant's counsel moved for a mistrial, or, at the least, requested that the court give a cautionary instruction to the jury regarding the cross-examination of Simpson by the prosecutor. According to appellant's counsel, the prosecutor had demeaned and ridiculed Simpson's black culture and the manner in which she spoke. Appellant argued that the error was compounded by the fact that it was an all-white jury. After argument, the trial court overruled the motion.

Appellant testified that there had been no romantic relationship between him and Buttons, and that Buttons and Jay had contacted him only to buy drugs. Appellant further testified that he had been involved in an automobile accident on March 21, 1994 and that, the day after, he slept most of the day. He testified that he did not go to Jay and Buttons's house on the day before the killings. He testified that, on the night of the shooting, he and Shelly got into an argument at Partner's Lounge over his selling drugs and that the argument had not arisen from his alleged involvement with Buttons.

The jury began its deliberations on the afternoon of October 26, 1994. The day closed without its reaching a verdict. Deliberations continued the next day. During deliberations, the jury sent a number of questions and requests to the court and, at 2:15 p.m. on October 27, sent a note to the trial court indicating that the members were unable to reach an unanimous conclusion. The trial court then gave the *Howard* charge. The jury reached a verdict at approximately 5:00 p.m. that afternoon. After appellant was found guilty on each of the counts of aggravated murder and on the firearm specifications, he filed the instant appeal.

Appellant's counsel has raised seven assignments of error. In addition, appellant has filed a *pro se* brief in which he raises one additional assignment of error.

In the first assignment of error, appellant argues:

"The Trial Court erred in denying the Defendant–Appellant's Motion to Suppress Voice Identification and Motion to Strike Voice Identification, thus denying the Defendant–Appellant his due process of law and right to a fair trial."

Appellant argues that the trial court erred in overruling his motion to suppress the voice identification given by Kim Backus and the motion to strike her testimony at trial. Appellant argues that the totality of the circumstances shows that the identification made by Kim was not reliable and that the methods used by the police led to a likelihood of misidentification. Appellant argues that Kim was only fourteen years old at the time of the incident. Appellant further argues

that Kim had very little contact with appellant and was not in a position during the commission of the crimes to properly identify appellant's voice. Appellant notes that Kim testified that she had never spoken face-to-face with appellant and that she did not know appellant's last name until it was given to her by Det. McKnight.

Appellant further notes that he was already in custody at the time Det. McKnight interviewed Kim. Appellant argues that there were no voice comparisons performed and that the police showed Kim only one photograph, that of appellant. Appellant thus argues that the procedures used by the police in this case were unduly suggestive.

When a witness has identified a defendant before trial, due process requires a court to suppress the identification only where (1) the identification procedures used by the police were unnecessarily suggestive, and (2) the identification was unreliable under the totality of the circumstances. *Neil v. Biggers* (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401; *State v. Waddy* (1992), 63 Ohio St.3d 424, 438, 588 N.E.2d 819, 830–831. The factors to be considered in determining whether the identification was reliable include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Neil v. Biggers, supra*, 409 U.S. at 199, 93 S.Ct. at 382, 34 L.Ed.2d at 411.

Applying these factors to the instant case, we cannot say that the identification was unreliable. Kim Backus testified that, prior to the killings, appellant had visited Buttons at the house. Kim further testified that although she had never had a direct conversation with appellant, she had overheard him talking to Buttons and to other people.

Kim further testified at the suppression hearing that, when she first called the police, she told them that "Marcus" was the perpetrator. Kim also testified that, when she was shown the photograph of appellant, she was simply asked if she had seen that person before. When Kim responded that she had and that this was the "Marcus" she knew, it was at that point that the police gave her the last name of appellant.

Further, Kim clearly recognized appellant's voice and came up with the name of "Marcus" herself. She demonstrated with certainty during her testimony at trial and at the suppression hearing that the voice she heard on the night of the murders was that of appellant.

Based upon the foregoing, we find that the trial court did not err in overruling the motion to suppress and the motion to strike the testimony at trial.

The first assignment of error is without merit.

In the second assignment of error, appellant argues:

"The Trial Court erred in overruling the Defendant–Appellant's Objection to the Prosecutor's peremptory challenge as to the only black juror, thus denying the Defendant–Appellant his due process of law and equal protection by being denied his right to enjoy a trial by an impartial jury of his peers as guaranteed by the Sixth and Fourteenth Amendments to the Constitution."

Appellant cites *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, and argues that, upon a defense objection to the state's use of a peremptory challenge during jury selection, a defendant must satisfy a three-part test in order to prove a constitutional violation of racial discrimination. First, the defendant must show that he or she is a member of a minority racial group. Secondly, the defendant must show that one of the group's members has been excluded from the jury. Finally, the defendant must show that the circumstances of the exclusion give rise to an inference that the exclusion was based on race. Appellant argues that *Batson* requires that once the prima facie case of discrimination is established, the burden shifts to the prosecution to explain its peremptory challenge with a racially neutral reason.

Appellant argues that, in the instant case, the trial court handled appellant's objection incorrectly by letting the prosecutor explain the use of the peremptory challenge and then deciding that appellant's counsel did not meet its burden of establishing the discrimination.

Appellant also cites this court's decision in *State v. Mosley* (Sept. 21, 1993), Mahoning App. No. 88 C.A. 24, unreported, 1993 WL 372281. In *Mosley*, the prosecution excused two African-American women through the use of peremptory challenges and the defendant, who was an African-American male, objected to the state's use of the peremptory challenges on the basis that the prosecution was making the challenges on the grounds of race. Upon the defendant's objection, the prosecution did not set forth on the record a race-neutral reason for the challenges. With regard to one of the jurors, the prosecution simply responded that he exercised his peremptory on the basis of the juror's answers to his questions, and that the juror's answers were comparable with another juror who had been excused who was not African-American. With regard to the second excused juror, the prosecutor made no response to the defendant's objection, nor did the trial court rule on the objection. This court found that since the prosecutor did not come forward with a neutral explanation for his action, the judgment of the trial court must be reversed.

The instant case is clearly distinguishable. The prosecutor clearly set forth, on the record, race-neutral reasoning for the challenge. Based upon this, the trial

court found that appellant had not established purposeful discrimination on the part of the prosecution. This ruling was supported by the record.

The second assignment of error is without merit.

In the third assignment of error, appellant argues:

"The Trial Court erred in denying the Defendant–Appellant's Motion for a New Trial based on Prosecutorial Misconduct, thus denying Defendant–Appellant of his due process of law and right to a fair trial."

Appellant argues that during the cross-examination of one of appellant's alibi witnesses, Trabion Simpson, the prosecuting attorney engaged in racially demeaning and discriminatory methods of addressing the witness. Appellant argues that this was done in front of an all-white jury and that he was thus prejudiced by such conduct. Appellant argues that the case was close, as indicated by the fact that the *Howard* charge was given to the jury. Appellant argues that the prosecutor's alleged improper use of the peremptory challenge along with the cross-examination of Trabion Simpson denied appellant his right of due process.

The alleged misconduct of a prosecutor during trial cannot be made a ground of error unless the conduct deprives the defendant of a fair trial. *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394, 400–401. The effect of the alleged misconduct must be judged in the context of the entire trial. *State v. Keenan* (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203, 209–210, citing *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431. One factor relevant to the due process analysis is whether the alleged misconduct was an isolated incident in an otherwise properly tried case. *State v. Keenan, supra,* at 410, 613 N.E.2d at 209–210. In order to excuse a prosecutor's improper remarks, it must be clear beyond a reasonable doubt that, absent the remarks, the jury would have found the defendant guilty. See *State v. Maurer* (1984), 15 Ohio St.3d 239, 267, 15 OBR 379, 403–404, 473 N.E.2d 768, 793–794.

Turning to the instant case, it is clear from the transcript that the prosecutor used a different method for the cross-examination of Trabion Simpson than he used with the other witnesses. Taking the cross-examination as a whole, however, it does not appear that the prosecutor's method was improper. The prosecutor was clearly attempting to discredit Simpson's testimony by cross-examining her regarding her admitted drug use. While the prosecutor's tone of voice may have, at times, been a mocking one, we cannot say that, in the context of the entire trial, the conduct deprived appellant of a fair trial.

The third assignment of error is without merit.

In the fourth assignment of error, appellant argues:

"The Trial Court erred in it's [sic] instructions to the jury by using the suggestive and improper example of the rabbits' footprints to explain circumstantial evidence, thus denying the Defendant–Appellant of his due process of law and right to a fair trial."

During its charge to the jury, the trial court instructed the jury on the use of circumstantial evidence and gave the following example:

"It is customary for the Court to give an example of circumstantial evidence at this point. Sometimes the jury instructions that we use are made more clear by example. When I was a Bailiff here, Judge Osborne used to use an example that I continue to use because I think it's simple enough, but it is explicit enough to explain what we're talking about.

"If you were to go to bed tonight and you see the snow falling and there's a fresh blanket of snow in your back yard, and you wake up in the morning and you see that there are rabbit tracks across your back yard, you haven't seen the rabbit cross the yard, you haven't heard the rabbit cross the yard, but there is evidence there that a rabbit did cross the yard. The direct evidence is there are tracks there, and from that direct evidence you may conclude and infer that some time after you went to bed and before you woke up, a rabbit did indeed cross your yard."

Appellant argues that the example given to the jury regarding the rabbit's footprints was not requested by either party and was not included in any written jury instructions, including Ohio Jury Instructions. Appellant argues that the example was unduly suggestive, since the state's case was entirely circumstantial and the footprint was offered by the state as evidence. Appellant argues that the trial court should have given a cautionary instruction to the jury so as to not prejudice appellant with the example.

Jury charges must be reviewed in the context of the entire instruction. *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772. A trial court may tailor the language of its instructions to suit the factual circumstances in the case before it, and a reviewing court will reverse only upon a showing of abuse of discretion. See, generally, *State v. Scott* (1987), 41 Ohio App.3d 313, 535 N.E.2d 379.

In the instant case, the trial court made it clear that the questioned instruction was given solely to clarify for the jury's benefit the concept of circumstantial evidence. We cannot say that the use of this instruction was arbitrary, capricious, or unreasonable, and find that the trial court did not abuse its discretion in overruling appellant's objection in this regard.

The fourth assignment of error is without merit.

In the fifth assignment of error, appellant argues:

"The Trial Court erred in that the verdict reached by the jury was against the manifest weight of the evidence presented during the trial, thus denying the Defendant–Appellant of his equal protection and his due process of law."

Appellant cites *State v. Apanovitch, supra,* 33 Ohio St.3d 19, 514 N.E.2d 394, and *State v. Mattison* (1985), 23 Ohio App.3d 10, 23 OBR 43, 490 N.E.2d 926, and argues that there are eight factors in determining whether a decision is against the manifest weight of the evidence: (1) whether the evidence was uncontradicted, (2) whether a witness was impeached, (3) what was not proven, (4) the reviewing court is not required to accept the incredible as true, (5) the certainty of the evidence, (6) the reliability of the evidence, (7) whether a witness's testimony is self-serving, and (8) whether the evidence is vague, uncertain, conflicting or fragmentary. Appellant also cites *State v. Jordan* (1992), 73 Ohio App.3d 524, 597 N.E.2d 1165, and argues that, in reviewing a challenge based upon the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences and consider the credibility of the witnesses. Appellant also argues that this court must also determine whether the trial court lost its way and created a miscarriage of justice.

Appellant argues that the evidence was contradicted. Appellant notes that he took the stand himself and also presented alibi witnesses to the court stating that he could not possibly have been at the location at the time of the shootings. Appellant argues that Kim Backus changed her testimony regarding how well she knew appellant from her direct testimony to her cross-examination testimony. Appellant further argues that the police officers' testimony was not consistent with Det. McKnight's regarding the investigation of the crime scene and killings. Appellant argues that the state did not show what was the murder weapon, where the weapon was, or who the perpetrator of the crimes was since there were no eyewitnesses, that there were no fingerprints, and that an atomic absorption test came out negative. In addition, appellant argues that the central element of prior calculation and design was not proved.

A reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that all the elements of the offense have been proven beyond a reasonable doubt. *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132. In *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, the court held at paragraph two of the syllabus:

"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence if believed would convince the average

mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

In *Jenks, supra,* at 273, 574 N.E.2d at 503, the court held that in reviewing both the weight and sufficiency of the evidence, the same test is applied, that is, the verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact.

Viewing the evidence as a whole, we cannot say that the jury lost its way. Kim clearly identified appellant as the individual who came to her home the evening of the murders and who was with her mother and Buttons just prior to the murders. Although Kim did not see appellant that evening, she testified that she recognized his voice when he came to the door and while he was talking to her mother and Buttons. Kim testified that appellant wanted to know if Buttons was cheating on him. Kim further testified that she heard appellant, her mother and Buttons talking, and that she then heard gunshots. In addition, the testimony of Jeffrey Lynn supports the jury's verdict in that Lynn determined that both appellant's shoe and the footprint had the same tread design and general size characteristics.

Where evidence adduced at trial reveals sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified. *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190; *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755. We find that the testimony of Kim Backus, especially her testimony that she heard appellant ask Buttons if she was cheating on him, along with the manner of the killings (gunshot wounds to the heads of the victims) was sufficient to establish the element of prior calculation and design beyond a reasonable doubt.

The fifth assignment of error is without merit.

In the sixth assignment of error, appellant argues:

"The Trial Court erred in overruling the objection of Defendant–Appellant's counsel as to the testimony of the State's expert witness as to the shoe print comparison, thus denying the Defendant–Appellant of his due process of law and right to a fair trial."

Appellant argues that Evid.R. 702(A) requires that an expert's testimony must relate to matters beyond the knowledge or experience possessed by laypersons.

Appellant argues that the testimony must assist the trier of fact and that the testimony so assists only if it relates to a matter "beyond the ken" of the ordinary person. See *State v. Koss* (1990), 49 Ohio St.3d 213, 551 N.E.2d 970.

Appellant argues that, in the instant case, Jeffrey Lynn did not administer any specific scientific tests to compare the tennis shoe and the plaster cast. Appellant argues that Lynn's opinion that the tread design and the general characteristics were the same is not the type of information that is beyond the jury's understanding or anything that would assist the jury in this case. Appellant argues that a strictly visual analysis is something that the jury could have done on their own when taking the evidence into the jury room.

■ We find that even though the test in the instant case required a visual comparison, the test in this case was a matter beyond the knowledge or experience possessed by laypersons. Lynn testified that he used a ruler or calipers to take specific measurements from different points on the tread of appellant's shoe to corresponding points on the plaster cast. Lynn also testified that, over the course of his fifteen-year career as a forensic scientist, he had performed between three hundred and four hundred shoe-print comparisons and testified as an expert on this subject approximately twenty-five times.

■ There is some case law suggesting that shoe-print comparison testimony can be lay opinion testimony. See *State v. Jells* (1990), 53 Ohio St.3d 22, 28, 559 N.E.2d 464, 470–471; *State v. Hairston* (1977), 60 Ohio App.2d 220, 222, 14 O.O.3d 191, 192–193, 396 N.E.2d 773, 774–775. However, the determination as to whether such testimony is lay or expert must be made on a case-by-case basis. We find that by virtue of Lynn's training and experience, he was uniquely qualified to make the shoe-print comparison in this case, that the comparison made was not one readily accomplished by a layperson, and that his testimony was helpful to the jury in analyzing all the evidence in the case.

The sixth assignment of error is without merit.

In the seventh assignment of error, appellant argues:

"The Trial Court erred in that the cumulative effect of all errors was prejudicial and deprived the Defendant–Appellant of his right to a fair trial."

Appellant cites *State v. DeMarco* (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256, and argues that, even though some errors individually may not give rise to prejudicial error, the cumulative effect of the errors can deprive the defendant of his right to a fair trial and cause the conviction to be reversed.

Since we have found no error with regard to the first six assignments of error, there were no errors to give rise to cumulative effect.

The seventh assignment of error is without merit.

In his *pro se* brief, appellant has raised one additional assignment of error:

"Was the cumulative effect of all the errors, even if any one of those errors in itself not reversible, had a combined-cumulative effect, denying Marcus Poole a fair trial in violation of the 14th Amendment?"

A review of appellant's *pro se* brief shows that he essentially makes the same argument in his assignment of error as his appellate counsel made in the seventh assignment of error. As we have found no merit with regard to any of the previous arguments, we find that there was no error giving rise to cumulative effect.

Appellant additionally argues in his *pro se* brief that the prosecuting attorney committed other instances of misconduct. Appellant argues that the prosecutor made mention in opening statements of evidence that neighbors had seen a man leaving 132 Tod Lane, but that no witness ever testified during trial that they saw a man leaving the scene. Appellant further argues that while Det. McKnight allegedly claimed that other witnesses told him that they had seen a man leaving the scene, no witness testified to that directly.

Appellant also argues that the prosecutor committed misconduct in cross-examining Shelly Taylor by insinuating that Shelly and appellant had severed their relationship and by insinuating that Shelly had told Det. McKnight that she had observed appellant leaving the residence at 132 Tod.

Appellant further argues that the prosecutor committed further misconduct during his cross-examination of appellant by insinuating that appellant told things to Det. McKnight which he did not. He also argues that the prosecutor committed misconduct by allowing Det. McKnight to identify the neighbor, Mr. Muhammad, as giving a physical description of the killer when Muhammad never testified at trial.

We have reviewed the entire record in this case. It is clear from our review that there was sufficient evidence upon which the jury could have found all elements of the crime proven beyond a reasonable doubt. While appellant argues that the prosecutor committed misconduct by putting words in the witnesses' mouths, we find that the prosecutor did nothing more than effectively cross-examine appellant and his alibi witnesses. Further, with regard to the prosecutor's questioning of Det. McKnight, it is clear that the prosecutor was attempting to have Det. McKnight outline his investigation chronologically and that some hearsay testimony may have been elicited. We cannot say, however, that appellant was prejudiced thereby or that this testimony deprived him of a fair trial. See *State v. Apanovitch, supra,* 33 Ohio St.3d 19, 514 N.E.2d 394.

Appellant's *pro se* assignment of error is without merit.

The judgment of the trial court is hereby affirmed.

*Judgment affirmed.*

JOSEPH E. O'NEILL, P.J., and COX, J., concur.