[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
{¶ 1} Defendant-appellant, Ronald Williams, appeals from judgments of sentence and conviction in the Franklin County Court of Common Pleas for aggravated robbery, robbery, kidnapping, and having a weapon under disability.
 {¶ 2} On June 5, 2001, appellant was indicted in case No. 01CR-06-3301 on one count of aggravated robbery, in violation of R.C.2911.01, two counts of robbery, in violation of R.C. 2911.02, and one count of kidnapping, in violation of R.C. 2905.01. The indictment arose out of an incident on May 11, 2001, in which two individuals robbed Gracie's Flower Market. Scott Payne was also named as a defendant in the indictment, and Payne was additionally charged under that indictment with various counts relating to a robbery incident occurring April 25, 2001, at the Village Petals floral shop.
 {¶ 3} On June 8, 2001, appellant was indicted in case No. 01CR-06-3338 on two counts of aggravated robbery, four counts of robbery, one count of kidnapping, and one count of having a weapon while under disability, in violation of R.C. 2923.13. This indictment arose out of an incident on May 29, 2001, in which two individuals robbed the State Employees Credit Union ("SECU"). Payne was also named as a defendant in that indictment.
 {¶ 4} On June 28, 2001, the state filed a motion for joinder of the cases, which the trial court subsequently granted. Prior to trial, appellant moved to suppress a duffel bag seized by law enforcement officials and to suppress a show-up identification made by one of the robbery victims. The trial court conducted a hearing on the motions, after which it overruled both motions to suppress. The cases came for trial before a jury beginning March 26, 2002.
 {¶ 5} On April 25, 2001, two black males entered Village Petals, a flower shop located at 573 South Grant Street, Columbus. One of the men, subsequently identified as Payne, pulled out a gun and told manager Chris Fryman that it was a robbery. Fryman was aware that another man had entered the store, but he only saw the face of the individual with the gun. The man holding the weapon pushed Fryman near the register and ordered him to get on the floor. The assailant then ordered Fryman to open the register; the man began taking money out of the register, and asked Fryman where the safe was located.
 {¶ 6} At about this time, another employee of Village Petals, Betty Athey, came out of a back room where she had been working. The second man pushed Athey down on the floor near Fryman, and then proceeded to the back room to look for the safe. He eventually found the safe, and told his accomplice to bring Fryman to the back room. Before taking Fryman to the back room, the man with the gun ordered Fryman to give up his wallet. Fryman opened the wallet and gave the man his money, but Fryman did not give up his identification cards despite demands by the assailant. Fryman eventually opened the safe in the back room and the men took various items, including a petty cash box. The man with the weapon also ordered Athey to remove her engagement and wedding ring, which she did.
 {¶ 7} The two men exited the store, and Fryman went to the door and observed the two men running down the street toward Livingston Avenue. Fryman watched the men jump into a van, and Fryman identified the van as a Ford Aerostar, possibly white in color. Fryman later identified Payne as the man who had held the gun on him during the robbery. A fingerprint matching Payne's was lifted from the cash register.
 {¶ 8} Robert Behrens was driving south on Grant Street when he noticed a white minivan parked in the wrong direction on the east side of the street. Behrens observed two men run up the sidewalk on the west side of the street and enter the van. At that time, Behrens also observed a man looking out the door of Village Petals, and Behrens thought something was wrong. Behrens pulled up behind the van and noted the license plate number of the vehicle, which he later provided to Fryman and the police.
 {¶ 9} On May 11, 2001, at approximately 4:00 p.m., two black males robbed Gracie's Flower Market, located at 516 South High Street. Mindy Bates, the owner of the store, was working in the front of the store when the two men entered. One of the men, later identified by Bates as appellant, was at the front counter looking at jewelry; the other man, later identified by Bates as Payne, paced back and forth and then suddenly spun around and pulled out a gun, pointing the weapon at Bates' back and neck. He grabbed Bates by the left arm, pushed her toward the cash register and demanded money.
 {¶ 10} Bates opened the register and gave the man the money. The men wanted more money, and Bates took $20 from a file drawer, but she explained that she had taken most of the money to the bank earlier that day. Bates' mother was in a back room at the time, undetected by the men, and managed to place a phone call to police during the incident. The man with the gun ordered Bates to get on the floor, holding the gun on her. Bates eventually heard the men leave the store, and police officers arrived within minutes of the incident. According to Bates, the men were in the store approximately three or four minutes, and she was able to see the faces of both assailants.
 {¶ 11} On the date of this incident, Eric Bush was walking on South High Street, near the intersection of High Street and Blenkner Street, when he observed two men leaving Gracie's Flower Market. The two men slid open the door of a white Ford Aerostar van, jumped into the vehicle, and drove north on High Street. The circumstances seemed odd to Bush, so he wrote down the license plate number of the vehicle. Bush walked home and then called the flower shop and provided the information he had obtained.
 {¶ 12} The license plate number of the van was registered to an address on Champion Avenue. Within two hours of the incident at Gracie's Flower Market, police officers observed a van near Champion and Livingston Avenues matching the description. The officers stopped the van, containing two adult females and several children, but the officers soon realized that these individuals had not been involved in the robbery. Marilyn Williams, appellant's sister, was driving the van. One of the occupants of the van indicated that a family member had driven the van earlier in the day, and the officers received information regarding an address on Bedford Avenue.
 {¶ 13} At approximately 6:00 p.m., a police officer transported Bates to a location where co-defendant Payne was seated in a police cruiser, and Bates identified him as the man who held the gun on her during the robbery. Bates was taken to another location a short distance away where she identified appellant as the other robber. Appellant and Payne were arrested, but were both released ten days later. At trial, Bates identified appellant and Payne as the two individuals who robbed her store.
 {¶ 14} On May 29, 2001, two black males entered the SECU, located at 20 East Long Street. As the men entered the building, they ordered employees and customers to get down on the floor. One of the men jumped past the teller line and went back to the manager's office. The man, who was wearing dark clothing and a hood pulled over his head, grabbed the manager, Molly Graham, by the shirt and dragged her across the floor. One of the men had a sawed-off shotgun, and he pointed it at a teller's head. The men started taking money out of the teller drawers. One of the teller drawers was locked, so Graham gave them the key, but the men still could not get the drawer open because it became stuck. One of the other tellers offered to help open the drawer.
 {¶ 15} While the robbery was in progress, Ed Maleszewski started to enter the building when he observed individuals lying on the ground and heard someone state, "put the money in the bag." (Tr. 1595.) Maleszewski stepped around the corner and began to dial 911. The two assailants realized they had been observed, and they ran out the door. Maleszewski was standing outside placing a call when one of the men came around the corner and asked Maleszewski to hand over his camera. Maleszewski did not have a camera, but the man grabbed his arm. The other man, holding a weapon, also came around the corner, and Maleszewski gave the men his phone. Maleszewski followed the men for a while, and observed them go to a parking lot and enter what appeared to be an older model, white Ford LTD.
 {¶ 16} Later that day, State Highway Patrol Trooper Ann Ralston was dispatched to the scene of a one-car traffic accident near State Route 285 and Interstate 70, in Guernsey County. Another trooper, Jeff Bernard, arrived a short time later. The occupants of the car, appellant and Payne, were seated outside of the vehicle when the troopers arrived. Appellant's leg was bleeding from the accident, and he had a black duffel bag at his side. After the troopers conducted a check, Payne was arrested for driving without a valid driver's license. An emergency squad arrived, and just before appellant was to be transported by emergency personnel for medical treatment, Trooper Bernard conducted a search of the duffel bag. Inside the bag, he discovered a large amount of money in wrappers, including dye packs. It was subsequently determined that the money and dye packs were from the SECU.
 {¶ 17} Appellant testified on his own behalf. Appellant resides at 693 Bedford Avenue, with his sister, Marilyn Williams. Appellant knew co-defendant Payne from his neighborhood. Appellant acknowledged that he was on parole, and that he was convicted in 1993 of robbing a Kroger store. Appellant stated that his nickname is "Charlie Brown."
 {¶ 18} Appellant denied robbing Gracie's Flower Market, and denied driving his sister's car on May 11, 2001. Appellant testified that, on that date, he had been doing work for a lawn care service, but he left work early and went home. At approximately 4:00 p.m., appellant was in the loft when he heard individuals coming up the stairs. Appellant stated that he was unaware the police were in the house, and he decided to remain in the loft after hearing what appeared to be threats. He eventually came down from the loft, and officers handcuffed him and took him outside.
 {¶ 19} Appellant testified that, on May 29, 2001, he was walking to a store when he saw an individual named "Brandon" who had a "for sale" sign on a car. Appellant asked Brandon how much he was asking for the car, and Brandon stated he would sell it to him for $300. Appellant "had some money" in his pocket at the time, and he handed Brandon $300. (Tr. 2025.) Appellant asked Brandon what he was "going to do with the stuff in the back of the car." (Tr. 2026.) Brandon said, "I'm cool, go on your way," so appellant "jumped in" the vehicle. (Tr. 2026.)
 {¶ 20} Appellant, who admitted he did not have a driver's license, drove away. Appellant noticed a duffel bag; he opened it and found a "hoody" and "some currency." (Tr. 2035.) Appellant stated that he "wasn't giving it back. I knew I had a lot of things I could do with this money." (Tr. 2036.) Appellant stopped at a telephone booth and called Payne. Appellant offered Payne, who had a driver's license, a "couple hundred dollars" to drive him to Zanesville. (Tr. 2039.) Payne agreed, and the two men headed toward Zanesville on the interstate, but they later realized they had missed an exit. Payne attempted to exit the highway, but the car brakes were not working properly, and the vehicle struck a gas meter and a light pole. Appellant had a scratch on his leg, and he exited the vehicle with the duffel bag. Appellant and Payne went into a nearby store, and Payne asked a clerk to call the police and an emergency squad.
 {¶ 21} Williams, appellant's sister, owns a Ford Aerostar van. Williams testified that she does not allow anyone else to drive her van. On the afternoon of May 11, 2001, Williams was driving her van when police officers stopped her. She told the officers that nobody had been driving her van earlier that day. The officers asked her for permission to search her house. According to Williams, she allowed the officers to search her house so she could recover her van sooner. Williams denied telling the officers that appellant drove the car earlier that day.
 {¶ 22} The jury returned verdicts finding appellant guilty on all counts. The weapon under disability count was tried separately to the trial court, and the court made a finding of guilty on that count. The trial court sentenced appellant by judgment entries filed June 3, 2002.
 {¶ 23} On appeal, appellant sets forth the following seven assignments of error for review:
1. The trial court erred in denying appellant's motion to sever the defendants for trial.
2. The trial court abused its discretion in overruling the appellant's motion to sever counts.
3. The trial court abused its discretion when it overruled appellant's motion to suppress evidence.
4. The trial court erred in overruling appellant's motion to suppress identification as the identification procedure was so unnecessarily suggestive and conducive to irreparable mistake as to deny appellant due process of law.
5. The trial court erred when it overruled objection to allow police officer to testify to another witness' out of court statement.
6. Prosecutorial misconduct was so prejudicial that it denied appellant a fair trial.
7. The conviction of appellant was against the manifest weight of the evidence.
 {¶ 24} Appellant's first and second assignments of error are interrelated and will be discussed together. Under these assignments of error, appellant asserts the trial court erred in denying his motion for severance of the defendants and in denying his motion to sever counts.
 {¶ 25} Appellant asserts that he was prejudiced by the trial court trying his case with that of co-defendant Payne, noting that Payne was charged with the robberies of Village Petals, Gracie's Flower Market and the SECU, whereas appellant was only charged with the robberies involving Gracie's Flower Market and the SECU. The record indicates that appellant's trial counsel, in requesting severance of the defendants, expressed concern that, if evidence of the Village Petals' robbery came before the jury, "the concept of guilt by association is going to come into play in the jurors' mind, and I think that it's going to cast an unfair shadow over Ronald Williams if the cases are tried together." (Tr. 529.) Counsel also argued potential prejudice because appellant's co-defendant was charged with assaulting a police officer, a charge not brought against appellant. On appeal, appellant argues that the jury probably confused the offenses, and viewed the Village Petals' evidence as corroborative of his guilt in the other robberies.
 {¶ 26} Crim.R. 8(A) provides that joinder of offenses is proper if the offenses "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim.R. 8(B) provides that two or more defendants may be charged in the same indictment "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct." Crim.R. 14, however, provides for relief from joinder "[i]f it appears that a defendant * * * is prejudiced by a joinder of offenses or of defendants."
 {¶ 27} In general, "[t]he joinder of defendants and the avoidance of multiple trials is favored in the law because joinder `conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses and minimizes the possibility of incongruous results in successive trials before different juries.'" State v. Jennings (June 19, 2000), Stark App. No. 1999-CA-00174. Whether an accused is to be tried separately from a co-defendant is a matter within the sound discretion of the trial court, and the burden is on the defendant to show good cause as to why a separate trial should be granted and that the court abused its discretion in refusing to grant separate trials. Id. Further, a defendant claiming error in the trial court's refusal to sever defendants has the burden of "affirmatively showing that his rights were prejudiced by the joinder." Id.
 {¶ 28} In State v. Sapp, Clark App. No. 99 CA 84, 2002-Ohio-6863, at ¶ 65-66, the court discussed the law relevant to severance of counts as follows:
Crim.R. 8(A) permits joinder when the charged offenses "are of the same or similar character." "The rule allows the admission of other-acts evidence for purposes other than proving that the accused acted in conformity with a particular character." * * * Crim.R. 8(A) also allows joinder of two or more offenses that "are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." * * *
A defendant may only move to sever counts under Crim.R. 14 if he can show actual prejudice from the joinder of the counts. * * * The state can negate the defendant's claim of prejudice in two different ways. Under the first method, referred to as the "other acts" test, the state must demonstrate that the evidence to be introduced at the trial of one offense would also be admissible at the trial of the other severed offense under the "other acts" portion of Evid.R. 404(B). * * * Under the second method, referred to as the "joinder test," "the state is not required to meet the stricter `other acts' admissibility test, but is merely required to show that evidence of each crime joined at trial is simple and direct." * * * The purpose of the "joinder test" is to prevent the jury from confusing the offenses or from improperly cumulating the evidence of the various crimes. * * * The "joinder test" "focuses on whether the trier of fact is likely to consider `evidence of one [offense] as corroborative of the other.'" * * *
 {¶ 29} We note that, while appellant opposed joinder at trial, he failed to renew his objection at the close of the state's evidence or at the conclusion of all of the evidence. Because of appellant's failure to renew his objection, he has waived all but plain error. State v. Saade, Cuyahoga App. No. 80705, 2002-Ohio-5564, citing State v. Walker (1990),66 Ohio App.3d 518, 522; State v. Brady (1988), 48 Ohio App.3d 41, 44. Under the plain error test, a reviewing court must consider whether, "but for the existence of the error, the result of the trial would have been otherwise." State v. Wiles (1991), 59 Ohio St.3d 71, 86.
 {¶ 30} As noted by the state, the offenses charged and tried were of the same or similar character (aggravated robbery through use of a firearm); further, the prosecution argued at trial that the three robberies were part of a course of criminal conduct. Thus, we find that the initial requirements under Crim.R. 8(A) and (B) were met.
 {¶ 31} We also find that appellant has failed to establish prejudice resulting from the joinder as the evidence was direct and uncomplicated; each of the robberies presented a simple factual situation, involved separate victims, and took place on different dates. Further, the prosecution presented the evidence in an orderly manner, and there is no indication that the jury was unable to segregate the proof as to each charge or as it pertained to each defendant. See State v. Smith (Sept. 30, 1993), Trumbull App. No. 91-T-4610 ("[a] defendant does not establish prejudice resulting from the joinder of criminal charges where the evidence presented by the state is direct and uncomplicated and the jury demonstrates its ability to segregate the proof on each charge"); State v. Vargas (Apr. 22, 2002), Stark App. No. 2001CA00044 ("the evidence against each defendant was direct and uncomplicated so that the jury was capable of segregating proof as to each defendant").
 {¶ 32} Regarding appellant's claim that he was prejudiced by "spillover" evidence, although the jurors were aware that the co-defendant, Payne, was charged with an additional crime that was separate from the charges against appellant, the trial judge limited potential prejudice by instructing the jury to consider each count separately. Specifically, the trial court instructed the jurors that the counts involving the robbery of Village Petals "concern only Mr. Scott Elliott Payne," and the court also made clear that the count involving the assault of the police officer "involves only Scott Elliott Payne." (Tr. 2338.) The jury is presumed to have followed the trial court's limiting instructions. State v. Raglin (1998), 83 Ohio St.3d 253, 264. Finally, as noted by the state, appellant has not attempted to argue that he would have defended any of the cases differently if the charges and/or defendants had not been joined. See State v. Franklin (1991),62 Ohio St.3d 118, 123; State v. Johnson (2000), 88 Ohio St.3d 95, 110.
 {¶ 33} Here, appellant has failed to show that the outcome of the trial would have been different had the trial court granted appellant's motions to sever defendants or counts. Accordingly, finding no plain error, appellant's first and second assignments of error are overruled.
 {¶ 34} Under the third assignment of error, appellant asserts that the trial court abused its discretion in overruling his motion to suppress evidence. Specifically, appellant moved at trial to suppress evidence of the $19,000 contained in the black duffel bag seized by the Ohio State Highway Patrol following the single-car accident near I-70 in Guernsey County. Appellant argues that no patrol officer indicated concern about weapons being in the duffel bag at the time of the warrantless search.
 {¶ 35} In considering a motion to suppress, "the trial court assumes the role of trier of fact and, accordingly, is in the best possible position to weigh the evidence and evaluate witness' credibility." State v. Mills (May 31, 1996), Montgomery App. No. 15465. At a hearing on a motion to suppress, the state bears the burden of proving that a warrantless search or seizure meets Fourth Amendment standards of reasonableness. State v. Hood (Aug. 25, 2000), Lucas App. No. L-00-1055. Further, "[a]n investigative stop requires evidence that the officer making the stop had a reasonable, articulable suspicion of criminal activity." Id. The standard to be applied is an objective one, and the issue is whether the state proved whether a reasonably prudent officer, based upon the totality of the circumstances, had a reasonable, articulable suspicion that a detainee is armed or dangerous, thereby justifying initiation of a protective search. Id.
 {¶ 36} In the present case, the trial court found that the troopers, in the course of the accident investigation, became suspicious of appellant and Payne based upon facts indicating that: co-defendant Payne had no valid driver's license; Payne gave the troopers a false name for appellant; the men gave differing information regarding who owned the car; and, appellant and Payne were acting nervous. The court also noted that one of the men was injured and about to leave the scene with medical personnel. The court concluded that, based upon the evidence presented, including the fact that appellant was going to take the duffel bag with him in the emergency vehicle, it was not unreasonable for the officer to perform a "Terry-type" search.
 {¶ 37} We note that in co-defendant Payne's appeal of his conviction, he similarly asserted that the trial court erred in failing to suppress the search of the duffel bag. In State v. Payne, Franklin App. No. 02AP-723, 2003-Ohio-4891, at ¶ 19-20, this court rejected Payne's challenge to the evidence, holding in relevant part:
In reviewing the record, this court [notes] that, although both Officers Ralston and Bernard indicated that they were not concerned for their own safety, the officers' testimony provided several articulable reasons for the search of the bag: (1) although both defendant and Williams answered the officers' questions, they were not always forthcoming with their answers; (2) defendant gave conflicting information regarding his social security number; (3) Williams would not say whose car they were driving; (4) defendant said it was his brother's car and gave the name, "William Brown"; (5) the car came back registered under the name "Meeko Williams"; (6) defendant said that they were coming from Zanesville and then changed the story and said that they were coming from Columbus; (7) defendant said that Williams' name was "Charlie Brown"; (8) Officer Bernard testified that, at that point in time, he was not certain who Williams really was; (9) defendant and Williams were acting nervous and Officer Bernard indicated that he thought that something was going on; (10) Williams kept the bag near him and took it to the ambulance with him (potentially putting the emergency personnel in danger); and (11) Officer Bernard testified that, with Williams about to leave the scene and in light of all of the above, he felt that he should search for weapons.
In light of the above testimony of the officers and the trial court's analysis, this court finds that the search of the black bag was permissible and that the contents of the bag were admissible in the trial against defendant and Williams. * * *
 {¶ 38} Even assuming that the decision in Payne, upholding the validity of the search, is not controlling in this case (i.e., under the law of the case doctrine), we find it highly persuasive, and we similarly conclude that the search of the bag was permissible. Appellant argues there was a lack of testimony by the troopers expressing concern about weapons in the duffel bag. However, for an officer to conduct a warrantless search for weapons, the officer need not be absolutely certain that an individual is armed; rather, "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio (1968), 392 U.S. 1, 27, 88 S.Ct. 1868. Further, "`[t]here is no legal requirement that a law enforcement officer feel "scared" by the threat of danger.'" State v. Featherston (Sept. 27, 1999), Fairfield App. No. 99 CA 9, quoting State v. Ringer (Oct. 16, 1997), Ashland App. No. 96 CA 1199. In the present case, the evidence indicates that a trooper searched the duffel bag just prior to the time medical personnel were preparing to transport appellant by ambulance to a hospital. Even if the troopers themselves did not express fear for their own safety, in light of the articulable reasons cited above, the trial court could have concluded that a reasonably careful law officer, out of concern that the safety of others may be threatened, was justified in making sure appellant was not armed. Considering the totality of the circumstances, the trial court did not err in denying appellant's motion to suppress.
 {¶ 39} Accordingly, appellant's third assignment of error is without merit and is overruled.
 {¶ 40} Under the fourth assignment of error, appellant argues the trial court erred in overruling his motion to suppress identification because, it is asserted, the procedure was so unnecessarily suggestive and conducive to irreparable mistake as to deny appellant due process of law.
 {¶ 41} At trial, counsel for appellant sought to suppress the identification testimony of Mindy Bates, the owner of Gracie's Flower Market. As noted under the facts, police officers initially transported Bates to a location for a "show-up," at which time she identified co-defendant Payne, who had been handcuffed following a scuffle with police. Appellant argues the facts indicate that Bates had been listening to a police radio and was informed of the status of the robbery as the investigation unfolded. Following these events, police officers took Bates to appellant's residence, at the same time SWAT officers were on the scene, and where appellant was forcibly removed from his home. Appellant argues that the "totality of these circumstances" clouded Bates' identification.
 {¶ 42} In State v. Lamb (July 21, 2003), Butler App. No. CA2002-07-171, at ¶ 49-50, the court discussed the applicable law in determining whether out-of-court identifications are constitutionally permissible, stating in relevant part:
To warrant suppression of identification testimony, the defendant bears the burden of establishing that the identification procedure was unreliable under the totality of the circumstances and "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Neil v. Biggers (1972), 409 U.S. 188,199, 93 S.Ct. 375, 382 * * *. Generally, a confrontation is unnecessarily or unduly suggestive when the witness has been shown but one subject. Manson v. Brathwaite (1977), 432 U.S. 98, 115,97 S.Ct. 2243, 2253 * * *. However, even if a confrontation is unnecessarily or unduly suggestive, identification testimony is not inadmissible solely for that reason. Instead, the reliability of the testimony is the linchpin in determining its admissibility. Biggers at 115,97 S.Ct. at 2253. So long as the identification possesses sufficient aspects of reliability, there is no violation of due process. Id.
Reliability of a witness's identification is determined by examining whether the identification was unreliable under the totality of the circumstances. State v. Poole (1996), 116 Ohio App.3d 513, 522 * * *. Factors that are relevant to this inquiry include: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the level of the witness's certainty at the confrontation; and (5) the length of time between the crime and the confrontation. Id. In order to suppress an identification, the court must find that the procedure employed was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. Biggers at 198-199, 93 S.Ct. at 381-382.
 {¶ 43} In the present case, although the identification at issue involved a "show-up," the trial court found, based upon consideration of the relevant factors, that the identification testimony was reliable. Specifically, regarding the opportunity of the witness to view the criminal at the time of the crime, the court found the witness to be "very credible," and noted that the testimony indicated the assailants were in the store for three to four minutes. As to the degree of observation, the court noted Bates was attentive due in part to the fact she was waiting on the men as customers in the store. Regarding the third and fourth factors, the court noted that Bates gave a description of the suspects to Officer Wright, and she indicated that she was more than 100 percent certain that both of the men participated in the robbery. Finally, regarding the length of time between the crime and confrontation, the court noted that the robbery took place at approximately 4:00 p.m., and the identifications took place between 6:00 and 7:00 p.m. The court found that the time frame weighed in favor of admissibility. Thus, based upon the totality of the circumstances, the court held that the testimony was admissible.
 {¶ 44} We note that this court previously found in Payne, supra, at ¶ 36, that "[t]he police in no way suggested to Bates that they have apprehended men who they believed may be the men who had robbed her." We similarly find that the record in this case, including the testimony of the officer who transported Bates to the show-up location, does not indicate that police officers made comments suggesting to Bates that she make a positive identification of appellant. More significantly, even assuming for purposes of argument that the show-up procedure was unnecessarily suggestive, we find no error with the trial court's determination that the identification was reliable based on the totality of the circumstances noted above.
 {¶ 45} Accordingly, appellant's fourth assignment of error is not well-taken and is overruled.
 {¶ 46} Under the fifth assignment of error, appellant asserts the trial court erred in overruling his objection to allowing a police officer to testify to another witness' out-of-court statement. As noted under the facts, on May 11, 2001, Marilyn Williams, the owner of the white van allegedly used in the robbery of the flower stores, was stopped by police officers and the officers questioned the occupants as to whether anyone had driven the van earlier that day. Williams testified that she did not allow anyone else to drive her van. However, during the state's case-in-chief, Columbus Police Officer William Kaufman testified, over objection, that one of the van's occupants stated that appellant used the van earlier that day. Specifically, Officer Kaufman testified that he and his partner questioned the occupants of the van, including one of the female occupants, and they asked this person whether anyone had been driving the van approximately two or three hours earlier that day. The female indicated that a family member had driven the vehicle, and she told the officer that this individual was at a location on Bedford Avenue. The officer testified that, as a result of the information received, the officers subsequently went to that location.
 {¶ 47} Appellant contends that the trial court's decision to allow the officer to testify permitted inadmissible hearsay to affect the outcome of this case. We disagree.
 {¶ 48} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Statements offered to explain an officer's conduct while investigating a crime are not hearsay. State v. Blevins (1987), 36 Ohio App.3d 147, 149. However, in order to avoid the potential for abuse, "[t]he conduct to be explained should be relevant, equivocal and contemporaneous with the statements." Id., citing 6 Wigmore, Evidence (Chadbourn Rev.Ed. 1976) 267, 268, Section 1772. Further, "such statements must meet the standard of Evid.R. 403(A)." Blevins, supra, at 149.
 {¶ 49} In the present case, we find no error in the admission of this testimony, as the statement was offered not for the truth of the matter asserted, but, instead, to explain the officers' conduct during the course of an investigation. Id. Further, the probative value was not outweighed by the danger of unfair prejudice. Finally, we note that the court gave the jury a limiting instruction not to consider the statement for the truth of the matter asserted, but, rather, as an explanation for why the police officers acted in the manner they did. Thus, any potential prejudice resulting from the testimony was "effectively cured" by the court's instructions, and it is presumed that the jury followed the instructions provided by the court. State v. Nelson (Feb. 25, 1999), Cuyahoga App. No. 73289.
 {¶ 50} Appellant's fifth assignment of error is without merit and is overruled.
 {¶ 51} Under the sixth assignment of error, appellant asserts that he was denied a fair trial as a result of prosecutorial misconduct. Appellant first cites the prosecutor's questioning of Officer Kaufman, discussed above, concerning whether anyone other than Williams had driven her van on the day of one of the robberies. Appellant also contends that prosecutorial misconduct occurred during closing argument, when the prosecutor used the limited admission of the statement for a much broader purpose. Specifically, appellant cites to the following portion of the prosecutor's closing argument:
Nevertheless, the police had stopped the right van, and I'm going to suggest to you that in this circumstance the police and not Marilyn Williams were telling you the truth.
The police officers testified, said we had a discussion and we said to you, who was driving this van earlier. Oh, I wasn't, my brother was. Where is he? He's at 693 Bedford. * * *
If you believe Marilyn Williams, oh, such a conversation never existed. Then you have to think to yourself, how did the police figure out that 693 Bedford is where the action was?
(Tr. 2314-2315.)
 {¶ 52} The applicable standard of review for prosecutorial misconduct "is whether the comments and/or questions by the prosecution were improper, and, if so, whether they prejudiced appellant's substantial rights." State v. Simpson, Columbiana App. No. 01-CO-29, 2002-Ohio-5374, at ¶ 14. However, "the touchstone of analysis is the fairness of the trial, not the culpability of the prosecutor." State v. Axson, Cuyahoga App. No. 81231, 2003-Ohio-2182, at ¶ 79. Thus, "prosecutorial misconduct will not provide a basis for reversal unless the misconduct can be said to have deprived the appellant of a fair trial based on the entire record." Simpson, supra, at ¶ 14.
 {¶ 53} At the outset, we note that defense counsel failed to object to any allegedly improper comments, and, thus, any challenge is waived on appeal unless it rises to the level of plain error. State v. Loch, Franklin App. No. 02AP-1065, 2003-Ohio-4701, at ¶ 43. In order to reverse a criminal conviction for prosecutorial misconduct, "we must be persuaded that the defendant would not have been convicted but for the alleged misconduct." Id.
 {¶ 54} In the instant case, while appellant again argues that the statement of the officer constituted hearsay, we have previously concluded that such statement was offered, not for the truth of the matter asserted, but, rather, to explain the subsequent conduct of the officers in going to Bedford Avenue. Further, upon review of the record, we agree with the state's contention that the comments by the prosecution during closing argument, taken in context, were made in response to a defense argument. Specifically, defense counsel had suggested during closing argument that police officers were randomly looking for individuals matching the description provided by witnesses, and that the officers merely happened upon appellant at the Bedford Avenue location. Moreover, even assuming that error occurred, appellant has not shown that such error affected the outcome of the proceedings. We also note the trial court instructed the jury that the evidence did not include opening statements or closing arguments of counsel, and it is presumed the jury followed the trial court's instructions. State v. Gore (Feb. 18, 1997), Franklin App. No. 96APC05-606.
 {¶ 55} Appellant's sixth assignment of error is without merit and is overruled.
 {¶ 56} Under his seventh assignment of error, appellant contends that his judgment of conviction was against the manifest weight of the evidence.
 {¶ 57} In considering a claim that a judgment is against the manifest weight of the evidence, this court, in reviewing the entire record, "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983), 20 Ohio App.3d 172, 175. Further, "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id.
 {¶ 58} At the outset, while appellant does not challenge the sufficiency of the evidence, we nonetheless note our agreement with the state that the record in this case contains sufficient evidence going to all the essential elements of the state's case upon which reasonable minds could conclude that appellant was guilty of the offenses charged. As noted by the state, the evidence presented includes testimony indicating that: appellant was identified during a show-up and at trial by the owner of Gracie's Flower Market; the van used in the robbery of Gracie's Flower Market was registered to appellant's sister; the car used in the credit union robbery was registered to appellant's brother; appellant and co-defendant Payne were found in possession of approximately $19,000, the amount taken from the credit union; the bag of money in appellant's possession contained dye packs placed with the money by the credit union; and, appellant and his co-defendant matched the description provided of the two men who robbed the credit union.
 {¶ 59} Appellant contends, with little elaboration, that the jury lost its way in this case. Appellant again asserts that he was prejudiced by the inclusion of co-defendant Payne at trial, and that all of the evidence pertaining to Payne resulted in a "guilt by association" verdict.
 {¶ 60} We have previously noted, however, in addressing appellant's first and second assignments of error, that the evidence as to the various incidents was simple and direct, such that the jury could reasonably sort the evidence as it pertained to each defendant. Thus, we rejected appellant's "spillover" claim. We also noted that the trial court carefully instructed the jury regarding the separate counts and the fact that the count relating to the Village Petals' incident pertained only to co-defendant Payne. Again, it is presumed that the jury was able to follow the instructions provided. Based upon this court's review of the record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we reject appellant's contention that the jury clearly lost its way and created such a manifest miscarriage of justice that appellant's convictions must be reversed.
 {¶ 61} Appellant's seventh assignment of error is without merit and is overruled.
 {¶ 62} Based upon the foregoing, appellant's seven assignments of error are overruled, and the judgments of the Franklin County Court of Common Pleas are hereby affirmed.
Judgments affirmed.
PETREE, P.J., and McCORMAC, J., concur.
McCORMAC, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.